J-S19002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.N.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.R., MOTHER | : | |
| | : | No. 2758 EDA 2018 |

Appeal from the Order Entered August 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0001387-2018

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STRASSBURGER*, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED MAY 17, 2019**

S.R. (Mother) appeals from the order, entered in the Court of Common Pleas of Philadelphia County, adjudicating S.N.R. (Child), born September, 2003, dependent, and finding Child the victim of abuse by Mother.   23 Pa.C.S.A. § 6303.   After our review, we affirm based on the opinion authored by the Honorable Joseph L. Fernandes.[1]

On April 2, 2018, the Philadelphia Department of Human Services (DHS) received a Child Protective Services (CPS) report that Mother was suffering

---

[1] We note that the court appointed counsel for Child, as well as a guardian *ad litem* (GAL).  Counsel for Child filed a letter to this Court indicating she would not be filing a brief on behalf of Child.  The GAL has filed a brief on appeal on behalf of Child, recommending this Court affirm the trial court's order adjudicating Child dependent and finding child abuse as to Mother.  Brief of Appellee S.N.R., at 16.  The Philadelphia Department of Human Services (DHS) also filed a brief as a participant, requesting this Court affirm the trial court's order.  Brief for Participant, at 31.

---

*   Retired Senior Judge assigned to the Superior Court.

from Munchausen syndrome by proxy.[2]  The report stated that Mother had made multiple medical specialist appointments for Child, including 37 calls to Child's primary care physician, 62 healthcare visits, and six emergency room visits in 2016, and 21 calls and 38 healthcare visits in 2017.  DHS filed a dependency petition on June 7, 2018, alleging Child was without proper care or control and that Child was a victim of child abuse as defined at 23 Pa.C.S.A. § 6303.  Dependency Petition, 6/7/18, at 1.[3]  Mother and Se.R. (Father) are recently divorced.

_____

[2] Munchausen syndrome by proxy, a mental illness, now known as Factitious Disorder Imposed on Another (FDIA), is considered a form of child abuse by the American Professional Society on the Abuse of Children. https://my.clevelandclinic.org/health/diseases/9834-factitious-disorder-imposed-on-another-fdia (last visited 4/17/19).  "In this mental illness, a person acts as if an individual he or she is caring for has a physical or mental illness when the person is not really sick. The adult perpetrator has the diagnosis (FDIA) and directly produces or lies about illness in another person under his or her care, usually a child under 6 years of age." *Id.*

[3] The dependency petition alleged, *inter alia*, that

> [Child] had developed conversion disorder, which is a mental condition in which a person has blindness, paralysis, or other nervous system symptoms that cannot be explained by medical evaluation.  The [CPS] report alleged that [Child] had developed ticks [sic] and automatic movements, and that [Child] began receiving mental health treatment through Children's Hospital of Philadelphia (CHOP) with a social worker and psychiatrist in 2016 because of her diagnosis; that [Child] had not shown any improvement and the ticks [sic] were still present; and that [Child] had been admitted to Cumberland Hospital for Children and Adolescents [Cumberland] in Virginia for inpatient mental health treatment as a result of her lack of improvement .  The report alleged that [Child] remained at Cumberland Hospital for

On June 25, 2018, pursuant to a protective custody order, Child was removed from Mother's care and placed in DHS' custody. Order of Protective Custody, 6/25/18. On July 23, 2018, the court held an adjudicatory/child abuse hearing and heard testimony from Brian Brennan, M.D., a child abuse pediatrics fellow at Children's Hospital of Philadelphia (CHOP). Both Mother and Father were present at the hearing, and Child participated by telephone. Doctor Brennan testified with respect to the issue of medical child abuse.

The evidence established that for the first two years of Child's life, medical visits were typical. N.T. Hearing, 7/23/18, at 31. Thereafter, medical visits increased exponentially, to 46 visits between the ages of two and five, and, by the age of five, Child had been prescribed twenty different medications. *Id.* at 28, 29-31. Child's healthcare team at CHOP noted Mother's behavior. CHOP characterized Mother as "hypervigilant" with Child, who was her only child.

In 2014, Child was diagnosed with amplified musculoskeletal pain syndrome (AMPS), a syndrome that causes amplified pain response to

---

Children and Adolescents for five to six months beginning in July 2017; that while hospitalized, Child showed great improvement and had lost all ticks [sic] and automatic behaviors; that when [Child] returned home around October 2017, she regressed and reverted to exhibiting automatic behaviors and ticks [sic]; and that since returning home, [Child] has made claims that she was sexually abused by [Father] and staff at Cumberland Hospital for Children and Adolescents.

Dependency Petition, 6/17/18, at 2-4.

relatively innocuous physical contact.  Despite the recommended treatment of "minimizing accommodations for the child" and "normaliz[ing] [Child's] existence," the increasingly frequent medical visits continued.

In 2016, during the time Mother and Father were going through divorce proceedings, Child was diagnosed with Conversion Disorder.[4]   This diagnosis led to inpatient admission to Cumberland Hospital for Children and Adolescents [Cumberland], a behavioral health hospital.  *Id.* at 37-38.  While there, and separated from Mother, Child showed marked improvement; she was discharged asymptomatic.[5]  *Id.* at 40-41.

In June 2018, approximately eighteen months after her discharge from Cumberland, Child was admitted to CHOP with severe paralysis; at this time, Dr. Brennan evaluated Child for medical child abuse.  *Id.* at 87, 90-91.  Doctor Brennan testified:

> [Child] did so well during her three months at Cumberland to the point she was asymptomatic and able to come home only to turn around within a month and—and decompensate to the point where she was having paralysis again and needing to be loaded into the

_____

[4] Conversion disorder, also called functional neurological disorder, is a condition in which abnormal movements or sensations (spells, weakness, tremors) are not due to injury or disease, but rather a result of a miscommunication of the nervous system and the body. https://my.clevelandclinic.org/health/diseases/17787-conversion-disorder-in-children--adolescents (last visited 4/17/19).

[5] When Child returned from Cumberland, she made allegations of prior sexual abuse when she was five or six, against Father.  These allegations were determined to be unfounded.  N.T. Hearing, 8/15/18, at 21-22.

car.  And—and then her doctors had to come down to the parking lot to see her.

*Id.* at 46.  Doctor Brennan noted the reference in Child's medical records to concerns that Mother was "catastrophizing" and exaggerating Child's symptoms and that Child was "over-medicalized."  *Id.* at 39-40, 87.  He also expressed concern that Mother and Child were "enmeshed."[6]  *Id.* at 44.

Doctor Brennan testified that in his opinion, to a reasonable degree of medical certainty, Child suffered from medical child abuse.  *Id.* at 42.  He explained:

> [M]edical child abuse is defined as a child who receives unnecessary and harmful or potentially harmful medical care at the instigation of the caregiver.  What used to be known as Munchausen's syndrome by proxy was kind of redefined relatively recently to exclude the intention of the caregiver.  In [Child's] case, [Child] has been provided multiple, multiple, multiple medical therapies and interventions that are potentially harmful and are unnecessary given what we — what we currently know. . . . In medical child abuse cases, it's difficult from that one-time clinical perspective to see things until they reach a point where you take a . . . big step back and you look at the constellation of everything that's going on and the severity of the— the psychopathology that the child is starting to exhibit that you really do start to . . . get that feeling that maybe this is something that you need to evaluate further[.]

*Id.* at 42-44.  At the time of that hearing, Child was at CHOP and suffering from "functional paralysis," which Dr. Brennan described as an inability to walk with no physical or organic explanation.  He stated that Child is able to transfer

---

[6] At the August hearing, both Mother and Child testified that they slept together on the living room sofa, and that they had done so for the past few years. N.T. Hearing, 8/15/18, at 55, 95-96.  In fact, Mother testified that this sleeping arrangement had started when Child was nine years old.  *Id.* at 96.

herself over to a wheelchair and that her legs move in her sleep. "And so, she's able to do things that someone who was legitimately paralyzed from the waist down would be unable to do." *Id.* at 91. At CHOP, Child was undergoing intensive psychotherapy. *Id.* at 92. At the conclusion of the hearing, the court ordered parental visitation at the discretion of the treatment team and Child, and scheduled a hearing for August 15, 2018.

At the August hearing, the court heard testimony from Child, Child's GAL, Mother, Father, DHS, and CUA caseworker/Catholic Community Services worker. Mother and Father were both represented by counsel. Also appearing were Child's legal counsel and a Child Advocates Staff Attorney. At the conclusion of the hearing, and following the argument of counsel, the court adjudicated Child dependent pursuant to the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6365, found clear and convincing evidence of child abuse under section 6303 of the Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301-6386, and ordered the CPS report changed from indicated to founded.

Mother raises three issues on appeal:

1. Did the trial court err and/or abuse its discretion when it found that the [DHS] had met its burden of finding, by clear and convincing evidence, that Child was dependent?

2. Did the trial court err and/or abuse its discretion when it found that the [DHS] had met is burden of establishing child abuse as to Mother by clear and convincing evidence?

3. Did the trial court err and/or abuse its discretion when it determined the [CPS] report was "founded" and changed the report from a "CY48" into a "CY49?"

Appellant's Brief, at vi (slightly reworded for clarity).

Our standard and scope of review from an order in a dependency case are well settled.

> We must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In re C.M.T.*, 861 A.2d 348, 351 (Pa. Super. 2004) (citations omitted).

Expert medical testimony established that it was Mother's actions—insisting on invasive and unnecessary medical intervention—that resulted in Child's ailments and diagnoses. Child was diagnosed with conversion disorder, and intensive behavioral health and psychiatry evaluation and treatment were recommended. However, Mother refused to accept that there was not a medical explanation for Child's symptoms, and continued to interfere in her treatment, requesting more invasive testing and medications, including a lumbar puncture. Nevertheless, under Mother's care, Child's condition continued to deteriorate until she could no longer complete age-appropriate activities of her daily life. Mother continued to insist on unnecessary treatments and accommodations for Child, such as a chair lift and pain

medication. By the time of Child's August 2017 hospitalization at CHOP, Mother was insisting on anti-seizure medications and cardiac monitoring.[7]

After our review of the parties' briefs, the record, and the relevant law, we conclude that the trial court properly found Child was dependent and that Mother committed child abuse pursuant to 23 Pa.C.S.A. § 6303(b.1)(2) ("[f]abricating, feigning, or intentionally exaggerating or inducing a medical symptom or disease which results in a potentially harmful medical evaluation or treatment to the child through any recent act.").[8]

_____

[7] The Child Protective Services Law (CPSL), 23 Pa.C.S.A. § 6301-6308, provides, in relevant part:

> **(b.1) Child abuse**.--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> * * *
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> (2) Fabricating, feigning, or intentionally exaggerating or inducing a medical symptom or disease which results in a potentially harmful medical evaluation or treatment to the child through any recent act.
>
> (3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act.

23 Pa.C.S.A. § 6303(b.1)(1)-(3).

[8] We note also that the trial court found Child's testimony not credible, found Father's testimony credible, and made no determination with respect to Mother's credibility. However, the court concluded that the evidence presented by the caseworkers and medical expert established that Mother

The trial court has comprehensively and correctly addressed Mother's claims on appeal. Accordingly, we affirm the trial court's August 15, 2018 order on the basis of Judge Fernandes' opinion.[9] We direct the parties to attach the trial court opinion in the event of future proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/17/19

---

posed a "grave threat" and that her visits would be suspended until further hearing and recommendation by Child's treatment team.

[9] W note a typographical error on page 10 of the trial court's opinion; the first word of the second paragraph should read "Mother's," not "DHS's."

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of S.N.R., a Minor | : | CP-51-DP-0001387-2018 |
| | : | |
| | : | FID: 51-FN-001206-2018 |
| | : | |
| APPEAL OF: S.R., Mother | : | 2758 EDA 2018 |

**OPINION[1]**

**Fernandes, J.:**

Appellant S.R. ("Mother") appeals from the order entered on August 15, 2018, adjudicating S.N.R. ("Child") dependent and finding child abuse against Mother. Carla Beggin, Esquire, counsel for Mother ("Mother's Counsel") filed a timely Notice of Appeal with a Statement of Matters Complained of on Appeal pursuant to Rule 1925(b) ("Statement of Errors").[2]

**Factual and Procedural Background:**

DHS became involved with this family on April 2, 2018, when DHS received a Child Protective Services ("CPS") report alleging that Mother suffered from Munchausen syndrome by proxy; Mother made multiple specialist appointments for Child and took Child to be examined by doctors; Mother was initially viewed as an anxious Mother but in 2016, Mother made 37 calls to the office Child's primary care physician ("PCP"), 62 healthcare visits, and six emergency room visits for Child; in 2017, Mother made 21 calls and 38 healthcare visits for Child; Child developed a conversion disorder;[3] Child developed ticks and other automatic movements; Child began receiving mental health treatment through Children's Hospital of Philadelphia ("CHOP") with a

---

[1] The trial court requested the Notes of Testimony for July 23, 2018, and August 15, 2018, on August 29, 2018. The trial court received the Notes of Testimony for July 23, 2018, on August 30, 2018. The trial court made a subsequent request for the August 15, 2018, Notes of Testimony on October 4, 2018, October 11, 2018, and October 17, 2018. The trial court received the Notes of Testimony for August 15, 2018, on October 23, 2018.

[2] Mother's Counsel filed the Notice of Appeal and Statement of Errors on September 11, 2018. Mother's Counsel's Proof of Service indicates that all parties were served by "first class United States mail, postage prepaid, e-filing and/or Courthouse mailbox." Trial Judge did not receive a copy of the Notice of Appeal and Statement of Errors from Mother's Counsel and was not made aware of this appeal until Trial Judge received a copy of the Appeal Docket Sheet from the Superior Court of Pennsylvania on October 4, 2018.

[3] Conversion disorder is a mental condition in which a person has blindness, paralysis, or other nervous system symptoms that cannot be explained by medical evaluation. (N.T. 07/23/18, pgs. 37-38).

social worker and psychiatrist in 2016 due to her diagnosis; Child had not shown any improvement and the ticks were still present; Child had been admitted to Cumberland Hospital for Children and Adolescents ("CHCA") in Virginia for inpatient mental health treatment as a result of her lack of improvement; Child remained at CHCA for five to six months, beginning in July 2017; while Child was hospitalized at CHCA, Child showed great improvement and lost all ticks and other automatic behaviors; when Child returned home to Mother in October 2017, she regressed and reverted to exhibiting automatic behaviors and ticks; after Child returned home from CHCA, she claimed that she was sexually abused by Father and staff at CHCA; Mother removed Child from school two years prior; Child no longer took dance lessons; Child was enrolled in a home school program; Child had little social contact; Mother stated that Child's behavior was a result of Father's actions; Mother had previously gone to Child's PCP's office and told another physician that Child was having terrible migraines; that physician sent Child to a neurologist; Mother returned to the PCP's office and spoke to a different physician about another issue and this pattern continued for 18 months until the PCP told Mother that she must address any issues with him only; since being given the limitation, Child's referrals to specialists lessened; Child has seen approximately 10-15 specialists, including a psychiatrist, weight control physician, ophthalmologist, and neurologist; Child recently stated that she was having anxiety and trouble sleeping; Child was attending therapy with a social worker and psychiatrist; Child was considered overweight; Child has been prescribed medication for mental health concerns; Mother and Father were going through a divorce; Mother appeared to be anxious; Mother described Father as an abusive person; Mother stated that the family had been involved with children and youth services authorities in the past. This report was indicated. DHS visited Child and Mother at their home on the same day. When DHS spoke with Child, Child denied the allegations; she did not believe that Mother was making her sick to get attention and that the symptoms were real; Mother was the only person who understood what she was going through; she no longer interacted with Father after he announced that he was divorcing Mother on Facebook; prior to the divorce, Child rarely interacted with Father because he was either working or rarely at home; Child was supposed to begin therapy sessions with Father but Mother told her that if she did not get better, Father would get full custody, which caused her a lot of anxiety; Child accused Father of sexually abusing her when she was about five or six years old, but was unable to give DHS further detail as to Father's actions other than that he came into her bedroom at night. During the interview, Child began making clicking noises with her mouth and

Page 2 of 14

Child stated that she could not control the sounds because she had conversion disorder; she began exhibiting the symptoms of the disorder a few years ago; the symptoms were due to stress at school and manifested after an incident in school where a fellow student sprayed mace into the air; she had pseudo-seizures; she sometimes had outbursts of stating the phrase "woo-hoo" and became paralyzed; staff at the hospital told her doctors that she was getting better but they lied and that she faked her improvement so that she could be discharged from the hospital. When DHS spoke with Mother, who also denied the allegations of the report, Mother stated that after the incident where the student sprayed mace in the air, Child developed ticks and pseudo-symptoms of physical disorders and illnesses; she had taken Child to many specialists to help care for Child and that could not be done without a referral from the PCP due to insurance restrictions. DHS later learned that Mother and Child had Personal Choice medical insurance.[4] Mother also stated that she never saw Father touch Child inappropriately; Child had not told her about the sexual abuse until recently via text message; Child never told her in detail about what happened with Father, but she was sure Child told the therapist. DHS assessed the home and determined that it was appropriate; however, DHS learned that although Child has her own bed and bedroom, Child and Mother slept in the living room in their own recliners. When DHS asked Child about the sleeping arrangements, Child explained that she could not sleep in her room because she was sexually assaulted by Father in her bedroom.

On May 1, 2018, DHS spoke with Father, who denied sexually assaulting Child, and he stated that he believed the allegations were a part of a plot for custody of Child by Mother; he was accused of many things since he initiated divorce proceedings against Mother two years ago; he believed he was accused of things whenever he did something to further the separation from Mother; this recent allegation arose two weeks after he signed the family home over to Mother; he believed that the allegations stemmed from the fact that he would not relinquish his parental rights to Child nor would he reunite with Mother; he could not have sexually abused Child because he was never allowed to be alone with Child; Mother was overly possessive of Child; he never went into Child's bedroom at night; he worked most nights as a firefighter and, except for one visit, had not seen Child outside of a hospital in the last two years; he was concerned about Child; Child had over 300 exams, laboratory tests, and other specialty services since she was nine years old; he visited Child

_____

[4] Personal Choice insurance does not require a referral to see a specialist.

while she was at CHCA and she was doing well there; Child regressed when she returned to Mother's care.

On May 11, 2018, Child attended a forensic interview at the Philadelphia Children's Alliance ("PCA"). When Child arrived, she told staff that she could not see anything because of her conversion disorder; however, Child was observed on video using her cellular telephone. Child kept her eyes closed throughout the entire interview. Child initially could not explain anything in detail that happened to her, but eventually stated that about five to eight years ago Father came into her bedroom and touched himself inappropriately before penetrating her. Child stated that she couldn't remember if this was a recurring event; she only recently remembered; she used to be strongly bonded with Father until two years prior; when Father separated from Mother, he began treating Mother poorly; she only disclosed to Mother because Mother told her that if she did not get her mental health and school issues under control, she would be sent to live with Father; she did not want to live with Father. When the interview ended, Child opened her eyes and was seen in the waiting area using her cellular telephone and listening to music.

On May 25, 2018, DHS received correspondence from Child's mental health treatment team at CHOP. The correspondence indicated that Mother had been hypervigilant about Child's health since she was a baby, even going so far as sleeping on the floor of Child's room, next to her crib, which was unwarranted because Child was a healthy baby; Mother's hypervigilance caused a strain on her marriage and Father disengaged from the family as Mother and Child became more and more enmeshed and continued to meet each other's emotional needs; Child began exhibiting somatic symptoms around age eight, after Father moved out of the home for an extended period of time; Child was eventually diagnosed with amplified musculoskeletal pain syndrome ("AMPS") after multiple visits to various specialists; Child began treatment for anxiety in 2014 and that anxiety triggered Child's AMPS; Child and Mother attended therapy sessions together for years without Father; Child began exhibiting conversion disorder symptoms in 2016; after Father moved out of the home in 2016, Child began suffering from pseudo-seizures, full body paralysis, and the inability to open her eyes and/or mouth, in addition to AMPS; Child's symptoms became so debilitating that she could no longer attend school or participate in age-appropriate activities; Father began participating in therapy while Child was at CHCA and it was recommended that the sessions continue once Child was discharged from CHCA; the focus of the therapy sessions

between Father and Child was to reengage Father in the family unit and to decrease Child's conversion disorder symptoms by diluting the enmeshment between Child and Mother so that Child could develop age appropriate autonomy and independence; after Child's symptoms regressed after she was discharged from CHCA, Mother removed Child from public school and enrolled Child in a cyber-school against the recommendation of Child's treatment team; Child was still attending therapy sessions with Father; however, her symptoms prevented her from attending sessions; when Father suggested petitioning the Domestic Relations Branch of Family Court to revisit his and Mother's shared custody arrangement, the therapy sessions resumed; when Child's symptoms did not decrease, the treatment team suggested that Child return to residential treatment; Child made accusations that Father sexually assaulted her shortly thereafter and Father's therapy sessions with Child ceased; the treatment team expressed concerns that while Mother did not strictly meet the definition of factitious disorder imposed on another, there was significant illness exaggeration and symptom reinforcement occurring; Child did not have any social interactions and Child and Mother's lives appeared to revolve around Child's physical symptoms and suspected ailments; Mother may be purposely attempting to keep Child from Father due to her own fear of loss and very significant enmeshment with Child; Child was caught in a destructive conflict between Father and Mother to the point that Child's well-being was being impacted.

On May 29, 2018, DHS learned that since 2016, Child had 25 x-ray examinations, three magnetic resonance imaging ("MRI") examinations, and two ultrasounds. Each examination showed that Child was experiencing pseudo-symptoms. Child's therapist stated that Mother was in denial of Child's strengths and limitations and felt that Child's health would improve once Father was no longer involved in her care; however, Father had not been involved for months and Child's symptoms had only increased.

On May 31, 2018, DHS received correspondence from Child's PCP. PCP stated that Child had an extreme number of office and emergency department visits; Child was examined by a large number of subspecialists; Child had been withdrawn from school and ceased all activities normal for a child her age; there were no organic causes for any of Child's symptoms; he referred Child for inpatient treatment at CHCA after medication and outpatient treatment did not work and that after Child regressed upon returning home, he questioned her about the regression and she stated that she hated hospitals so much that she did everything she could to be discharged, which suggested

that Child was able to control her symptoms; Child reported that she was sexually abused by hospital staff and Father; the hospital found no credibility in her statements regarding allegations of abuse at the hospital; he was concerned that Child's case showed signs of Munchausen syndrome by proxy and that Child and Mother were in collusion around Child's symptoms; Child was completely dysfunctional and in need of change of her environment, either in an institutional or foster care placement. PCP included a list of the number of visits to both the office and emergency room, telephone calls made by Mother regarding Child's health between 2009 and 2017, and a list of specialists that Child has been examined by so far.

Currently, Child is overweight and has been diagnosed with conversion disorder. Child is receiving treatment through CHOP and is on a 504 plan for special education accommodations in school due to her conversion disorder diagnosis. Mother is currently unemployed and was previously employed as a medical professional at CHOP. Mother has a history of mental health issues. DHS learned that Mother previously received therapy through Counseling Or Referral Assistance ("CORA") in 2017; however, she stopped attending after six sessions. Mother has previously been diagnosed with anxiety and depression. On June 7, 2018, DHS filed a dependency petition for Child.

On July 23, 2018, and August 15, 2018, an adjudicatory, child abuse and permanency hearing was held for Child. The trial court heard testimony from the DHS investigator, the CUA case manager, a physician from CHOP, Mother, Father, and Child. The trial court adjudicated Child dependent and found clear and convincing evidence that Child was a victim of child abuse under 23 Pa.C.S.A. §6303(b.1)(2). The trial court discharged the temporary commitment to DHS and fully committed Child. The trial court ordered CUA to do a home evaluation and clearances on Mother's home. The trial court referred Mother for a parenting capacity evaluation ("PCE"), BHS for a consultation and/or evaluation. The trial court also ordered Mother to provide verification of employment and found Mother to be a grave threat to the best interests of Child thereby suspending her visits and telephone contact with Child. If Mother was not employed, Mother was to be referred to ARC for employment. Furthermore, the trial court founded the CY48 and turned it into a CY49. On September 11, 2018, Counsel filed this appeal on behalf of Mother.

Page 6 of 14

**Discussion:**

On appeal, Mother states that the trial court erred and/or abused its discretion when:

1. It found that DHS, by clear and convincing evidence, had met its burden to establish that child abuse existed as to Mother.
2. It "founded" the CPS report of April 2, 2018, as to Mother.
3. It found that DHS, by clear and convincing evidence had met its burden to find Child dependent.

For the purpose of this opinion, Mother's issues will be consolidated to read: Did the trial court err or abuse its discretion when it found by clear and convincing evidence that Child was a victim of child abuse under 23 Pa.C.S.A. §6303 and therefore met the definition of a dependent child under the Juvenile Act? An issue is waived on appeal where it is not specifically presented in the Appellant's Pa.R.A.P. 1925(b) statement. *In re C.P.*, 901 A.2d 516, 522 (Pa. Super. 2006); *See In re J.E.D.*, 879 A.2d 288, 293, fn. 7 (Pa. Super. 2005). It should be noted that Mother did not appeal the finding of grave threat, thereby suspending her visits and telephone contact with Child. As such, Mother has waived her right to appeal the finding of grave threat and visit suspension.

Child abuse is defined at 23 Pa.C.S.A. §6303(b.1)(2) as fabricating, feigning, or intentionally exaggerating or inducing a medical symptom or disease, which results in a potentially harmful medical evaluation or treatment to the child through any recent act.[5] The existence of child abuse must be found by clear and convincing evidence but the identity of the abuser need only be established through prima facie evidence. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). Prima facie evidence of abuse is established under 23 Pa.C.S.A. §6381(d) as:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent... responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent... responsible for the welfare of the child.

This statutory section applies if the abuse is of a nature that would ordinarily not be sustained or exist except by reason of the acts of the parent and that the parent is proved to have had responsibility for the welfare of the child at the time of abuse. *In re L.Z.*, 111 A.3d at 1170.

---

[5] This is commonly referred to as "Munchausen Syndrome by Proxy" or "factitious disorder." The Opinion will refer to the act as medical child abuse.

Mother alleges that the trial court erred in finding child abuse by clear and convincing evidence. DHS obtained an OPC after the CHOP Child Abuse Clinic determined that Child was suffering from medical child abuse. (N.T. 08/15/18, pg. 20). It was established from the testimony of Dr. Brian William Brennan of CHOP ("Physician")[6] that Child suffered from medical child abuse based on the extensive medical history of Child. (N.T. 07/23/18, pg. 42, 49-50). Child was first evaluated by Physician in June 2018, after Child presented at the sexual abuse clinic at CHOP based on the allegations of sexual abuse by Father and the staff at CHCA. (N.T. 07/23/18, pgs. 24-25).[7] DHS has determined that the sexual abuse allegations made by Child were unfounded. (N.T. 08/15/18, pg. 29). After review of Child's medical records, Physician observed that Child had visited her PCP approximately 156 times, Mother made twice as many phone calls to the PCP as visits, and Child visited 15 different subspecialists. (N.T. 07/23/18, pgs. 29-30, 33-34). When Child began seeing a therapist for behavioral health around age 7, Child's medical utilization of medical appointments decreased during that time period. (N.T. 07/23/18, pgs. 35-36). By Child's pre-teen years, Child had been diagnosed with asthma, reflux, Severs Disease,[8] AMPS[9], and conversion disorder. (N.T. 07/23/18, pgs. 34, 37, 51). Following Child's diagnosis of AMPS, Child was diagnosed with conversion disorder where Child began having pseudo-seizures[10] involving leg movements and arm flailing. Child also had selective mutism, paralysis of the legs, and bizarre hallucinations including people in the room that were not present, people threatening to kill her, and bubbles on the sun. (N.T. 07/23/18, pgs. 38-39). In regards to Child's paralysis, there is no medical explanation and it can be described as a functional paralysis. (N.T. 07/23/18, pg. 91). Child was treated for her diagnosis at the CHCA behavioral health program in Virginia for three months (N.T. 07/23/18, pgs. 40-41). Child was discharged from CHCA after three months when she appeared to have completely recovered. (N.T. 07/23/18, pg. 41). Child and Mother have indicated that Child claims to have faked improvement by improving her symptoms in order to be

---

[6] All parties besides Mother's Counsel stipulated to Physician's CV and expertise in pediatrics and child abuse pediatrics. (N.T. 07/23/18, pg. 12). The trial court accepted Physician as an expert by knowledge. (N.T. 07/23/18, pg. 23; DHS Exhibit 1).

[7] Physician performed a verbal and cursory physical examination of Child, but Child was unable to cooperate with a general urinary exam. (N.T. 07/23/18, pg. 25). Physician also reviewed Child's medical records and spoke with both Child and Mother regarding Child's history. (N.T. 07/23/18, pgs. 25-26, 27-28).

[8] Severs Disease is the inflammation of the growth plate, commonly seen in the shoulders of little league pitchers. (N.T. 07/23/18, pgs. 51-52).

[9] AMPS is a syndrome where relatively innocuous contact leads to an amplified pain response. (N.T. 07/23/18, pgs. 34-35).

[10] Physician indicated that Child was having pseudo-seizures because Child did not have EEG patterns that indicated an actual seizure. (N.T. 07/23/18, pg. 38).

discharged from CHCA because Child did not want to remain in inpatient care. (N.T. 08/15/18, pgs. 16-17, 32-33, 50-51). Child claimed that her symptoms began reoccurring after her treatment at CHCA because she had to attend family therapy with Father and the stress of returning to school. (N.T. 08/15/18, pg. 52). Child's only organic pathological finding was the Severs Disease, which Child was treated for through physical therapy, but Child's records indicate that Child was experiencing symptoms not proportional to what is commonly seen in Severs Disease. (N.T. 07/23/18, pgs. 51-53). Many of Child's issues were self-resolving, but Child's medical records indicates that phone calls from Mother regarding the described ailments were not consistent with the physical exam on the following day. (N.T. 07/23/18, pg. 89). Physician noted that the most concerning issue regarding Child was that Mother and Child appeared to be enmeshed and that Child's behaviors related to the conversion disorder were enabled by Mother. (N.T. 07/23/18, pgs. 44-45). Additionally, Child's symptoms appeared to be amplified by Mother's presence, which was most noticeable during Child's stay at CHCA, where Child was discharged asymptomatic. (N.T. 07/23/18, pgs. 45-46). Physician noted that if Child were to be reunified with Mother, it would be likely that Child would begin having symptoms of conversion disorder again. (N.T. 07/23/18, pgs. 46-47). Additionally, if Child were to remain in Mother's care, there is a risk for Child's psychopathology to amplify over time and become more elaborate with more medical intervention. (N.T. 07/23/18, pg. 47). Child's medical record indicates an exaggeration and instigation of Child's symptoms, all consistent with medical child abuse. (N.T. 07/23/18, pg. 54). Through review of Child's medical records, concerns of medical child abuse have been raised by other medical professionals. (N.T. 07/23/18, pg. 69). On more than one occasion, Mother has over-exaggerated Child's symptoms. (N.T. 07/23/18, pg. 87). Mother was not always compliant with the medical recommendations given to Child. (N.T. 07/23/18, pgs. 37, 80-81, 83). Mother has been the primary historian throughout Child's medical treatment in terms of reporting symptoms and illnesses to medical professionals. (N.T. 07/23/18, pg. 88). Mother is also the primary caretaker of Child. (N.T. 08/15/18, pg. 22; DHS Exhibit 3). Before Child was born, Mother worked as an emergency medical technician ("EMT") for CHOP and it is common for parents in medical child abuse cases to have a medical background of some sort. (N.T. 07/23/18, pg. 44). Child has had far more medical interaction than would be typical of another child at the same level of health. (N.T. 07/23/18, pg. 78). Mother was aware that a doctor who worked with Child's PCP was concerned that Child was "over doctored." (N.T. 08/15/18, pg. 81). Mother claimed that she never forced

Child to go to the doctor when she did not want to go. (N.T. 08/15/18, pg. 73). Child's symptoms and medical care align with the ongoing custody litigation between Mother and Father (N.T. 08/15/18, pg. 35). Mother blames Father for Child's symptoms. (N.T. 08/15/18, pg. 86-87). Physician indicated that Child's proper course of treatment moving forward should be inpatient psychiatric care and for Mother, since the medical child abuse involved is conversion disorder, the recommendation is behavioral health therapy. (N.T. 07/23/18, pg. 48). Physician also indicated that Mother declined to attend psychotherapy when recommended in 2014, although Mother claimed that she did attend therapy. (N.T. 08/15/18, pgs. 78-79). The trial court found Physician's testimony very compelling and credible. Based on the testimony on July 23, 2018, and August 15, 2018 the trial court found clear and convincing evidence that Mother's prolonged intentional exaggeration of Child's symptoms resulted in medical child abuse under 23 Pa.C.S.A. §6303(b.1). Furthermore, there was prima facie evidence that Mother is the perpetrator of child abuse under 23 Pa.C.S.A. §6381(d) since Mother was the primary caregiver for Child. Mother was unable to rebut the presumption. Consequently, the trial court did not err or abuse its discretion in finding child abuse.

DHS's next issue on appeal asked whether the trial court erred in adjudicating Child dependent based on clear and convincing evidence. A "Dependent Child" will be adjudicated dependent if the trial court determines, by clear and convincing evidence, that Child is without proper parental care or control, subsistence, education, as required by law, or other care or control necessary for Child's physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian. Clear and convincing evidence has been defined as testimony by credible witnesses who clearly relate facts that are so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In Interest of J.M.*, 166 A.3d 408, 427 (Pa. Super. 2017) (*citing In Re Novosielski*, 992 A.2d 89, 107 (Pa. 2010)). The purpose of the Juvenile Act is to preserve the unity of the family whenever possible. 42 Pa.C.S.A. § 6301(b)(1). Nonetheless, a child will be adjudicated dependent when the child is presently without proper parental care and the care is not immediately available. *In re R.T.*, 592 A.2d 55, 57 (Pa. Super. 1991) (*citing In Re LaRue*, 366 A.2d 1271 (Pa. Super. 1976)). Superior Court has defined proper parental care as the care which is geared to the particularized needs of

Page 10 of 14

the child and, at a minimum, is likely to prevent serious injury to the child. *In re C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997) (*citing In Interest of Justin S.*, 543 A.2d 1192, 1200 (Pa. Super. 1988)). A CY48 report is deemed to be founded if there has been any judicial adjudication based upon a finding that a child who is a subject of the report has been abused. *J.G. v. Dept. of Public Welfare*, 795 A.2d 1089, 1092 (Pa. Commw. Ct. 2002).

Mother alleges that the trial court erred in adjudicating child dependent by clear and convincing evidence. DHS obtained an OPC after the CHOP Child Abuse Clinic determined that Child was suffering from medical child abuse. (N.T. 08/15/18, pg. 20). It was established from the testimony of Dr. Brian William Brennan of CHOP ("Physician") that Child suffered from medical child abuse based on the extensive medical history of Child. (N.T. 07/23/18, pg. 42, 49-50). Child was first evaluated by Physician in June 2018, after Child presented at the sexual abuse clinic at CHOP based on the allegations of sexual abuse by Father and the staff at CHCA. (N.T. 07/23/18, pgs. 24-25). DHS has determined that the sexual abuse allegations made by Child were unfounded. (N.T. 08/15/18, pg. 29). After review of Child's medical records, Physician observed that Child had visited her PCP approximately 156 times, Mother made twice as many phone calls to the PCP as visits, and Child visited 15 different subspecialists. (N.T. 07/23/18, pgs. 29-30, 33-34). When Child began seeing a therapist for behavioral health around age 7, Child's medical utilization of medical appointments decreased during that time period. (N.T. 07/23/18, pgs. 35-36). By Child's pre-teen years, Child had been diagnosed with asthma, reflux, Severs Disease, AMPS, and conversion disorder. (N.T. 07/23/18, pgs. 34, 37, 51). Following Child's diagnosis of AMPS, Child was diagnosed with conversion disorder where Child began having pseudo-seizures involving leg movements and arm flailing. Child also had selective mutism, paralysis of the legs, and bizarre hallucinations including people in the room that were not present, people threatening to kill her, and bubbles on the sun. (N.T. 07/23/18, pgs. 38-39). In regards to Child's paralysis, there is no medical explanation and it can be described as a functional paralysis. (N.T. 07/23/18, pg. 91). Child was treated for her diagnosis at the CHCA behavioral health program in Virginia for three months (N.T. 07/23/18, pgs. 40-41). Child was discharged from CHCA after three months when she appeared to have completely recovered. (N.T. 07/23/18, pg. 41). Child and Mother have indicated that Child claims to have faked improvement by improving her symptoms in order to be discharged from CHCA because Child did not want to remain in inpatient care. (N.T. 08/15/18,

pgs. 16-17, 32-33, 50-51). Child claimed that her symptoms began reoccurring after her treatment at CHCA because she had to attend family therapy with Father and the stress of returning to school. (N.T. 08/15/18, pg. 52). Child's only organic pathological finding was the Severs Disease, which Child was treated for through physical therapy, but Child's records indicate that Child was experiencing symptoms not proportional to what is commonly seen in Severs Disease. (N.T. 07/23/18, pgs. 51-53). Many of Child's issues were self-resolving, but Child's medical records indicates that phone calls from Mother regarding the described ailments were not consistent with the physical exam on the following day. (N.T. 07/23/18, pg. 89). Physician noted that the most concerning issue regarding Child was that Mother and Child appeared to be enmeshed and that Child's behaviors related to the conversion disorder were enabled by Mother. (N.T. 07/23/18, pgs. 44-45). Additionally, Child's symptoms appeared to be amplified by Mother's presence, which was most noticeable during Child's stay at CHCA, where Child was discharged asymptomatic. (N.T. 07/23/18, pgs. 45-46). Physician noted that if Child were to be reunified with Mother, it would be likely that Child would begin having symptoms of conversion disorder again. (N.T. 07/23/18, pgs. 46-47). Additionally, if Child were to remain in Mother's care, there is a risk for Child's psychopathology to amplify over time and become more elaborate with more medical intervention. (N.T. 07/23/18, pg. 47). Child's medical record indicates an exaggeration and instigation of Child's symptoms, all consistent with medical child abuse. (N.T. 07/23/18, pg. 54). Through review of Child's medical records, concerns of medical child abuse have been raised by other medical professionals. (N.T. 07/23/18, pg. 69). On more than one occasion, Mother has over-exaggerated Child's symptoms. (N.T. 07/23/18, pg. 87). Mother was not always compliant with the medical recommendations given to Child. (N.T. 07/23/18, pgs. 37, 80-81, 83). Mother has been the primary historian throughout Child's medical treatment in terms of reporting symptoms and illnesses to medical professionals. (N.T. 07/23/18, pg. 88). Mother is also the primary caretaker of Child. (N.T. 08/15/18, pg. 22; DHS Exhibit 3). Before Child was born, Mother worked as an emergency medical technician ("EMT") for CHOP and it is common for parents in medical child abuse cases to have a medical background of some sort. (N.T. 07/23/18, pg. 44). Child has had far more medical interaction than would be typical of another child at the same level of health. (N.T. 07/23/18, pg. 78). Mother was aware that a doctor who worked with Child's PCP was concerned that Child was "over doctored." (N.T. 08/15/18, pg. 81). Mother claimed that she never forced Child to go to the doctor when she did not want to go. (N.T. 08/15/18, pg. 73). Child's symptoms

and medical care align with the ongoing custody litigation between Mother and Father (N.T. 08/15/18, pg. 35). Mother blames Father for Child's symptoms. (N.T. 08/15/18, pg. 86-87). Physician indicated that Child's proper course of treatment moving forward should be inpatient psychiatric care and for Mother, since the medical child abuse involved is conversion disorder, the recommendation is behavioral health therapy. (N.T. 07/23/18, pg. 48). Physician also indicated that Mother declined to attend psychotherapy when recommended in 2014, although Mother claimed that she did attend therapy. (N.T. 08/15/18, pgs. 78-79). DHS indicated the CPS report as to Mother based on medical evidence and the fact that Mother was the primary caretaker of Child. (N.T. 08/15/18, pg. 22). In addition to Child's medical history, Mother's home is in question because although Child has a bedroom, Child chooses to sleep on a couch in the living room next to Mother and has done so for several years. (N.T. 08/15/18, pg. 23). Mother also testified that she believed placement outside of the home is appropriate for Child, if Child is placed in a specialized treatment facility. (N.T. 08/15/18, pg. 88). Consequently, Mother is in agreement with the trial court's disposition decision. Placement outside the home is the least restrictive setting for Child to receive the specialized treatment needed. The record reflects that there was clear and convincing evidence to adjudicate Child dependent as it is unsafe for Child to return to Mother's care. Mother does not have the present ability to care for Child's physical, mental, or emotional health. The trial court found the DHS witnesses credible. Therefore, the trial court did not err or abuse its discretion in finding Child dependent and determining the CPS report founded.

**Conclusion:**

For the aforementioned reasons, the court found that DHS met its statutory burden by clear and convincing evidence regarding the finding that Child was a victim of medical child abuse pursuant to 23 P.C.S.A. §6303(b.1)(2). DHS also met its statutory burden by clear and convincing evidence that Child met the definition of a dependent child under the Juvenile Act. Accordingly, the order entered on August 15, 2018, should be affirmed.

By the court,

Joseph Fernandes J.

**IN THE COURT OF COMMON PLEAS**
**FOR THE COUNTY OF PHILADELPHIA**
**FAMILY COURT DIVISION**

| | |
|---|---|
| In the Interest of S.N.R., a Minor | : CP-51-DP-0001387-2018 |
| | : |
| | : FID: 51-FN-001206-2018 |
| | : |
| APPEAL OF: S.R., Mother | : 2758 EDA 2018 |

## CERTIFICATE OF SERVICE

I hereby certify that this court is serving a copy of this duly executed Opinion upon all counsel on November 28, 2018. The names and addresses of all persons served are as follows:

Lindsey Cordes, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, Pennsylvania 19102
Lindsey.Cordes@phila.gov
Attorney for D.H.S.

Shane Thompson, Esq.
1706 Race Street, 4th Floor
Philadelphia, Pennsylvania 19103
Attorney for Father

Barry Kassel, Esq.
Support Center for Child Advocates
1617 John F. Kennedy Blvd., Suite 1200
Philadelphia, Pennsylvania 19103
bkassel@sccalaw.org
Attorney for Child

Jalaine Stokes, Esq.
Defenders Association of Philadelphia
1441 Sansom Street
Philadelphia, Pennsylvania 19102
jstokes@philadefender.org
Guardian Ad Litem

Carla Beggin, Esq.
1800 John F. Kennedy Blvd., Suite 300
Philadelphia, Pennsylvania 19103
begginlaw@mac.com
Attorney for Mother

BY: _____
Ariel J. Bruce
Law Clerk to the Hon. Joseph L. Fernandes
First Judicial District of Pennsylvania
Family Division
1501 Arch St., Room 1431
Philadelphia, Pa. 19102
T: (215) 686-2660 | F: (215) 686-4224
Ariel.bruce@courts.phila.gov

Page 14 of 14